## FIDELITY & DEPOSIT CO. OF MD. *v.* LONG *et al.*

### (*Jackson,* April Term, 1917.)

1. **PRINCIPAL AND SURETY. Action. Evidence. Sufficiency.**

 In an action by a fidelity company to recover for alleged wrong-
 ful acts regarding funds coming into the office of defendant
 county clerk whose bond plaintiff had signed, evidence *held*
 to sustain finding that an agreement between friends of the
 county clerk, who had reimbursed the plaintiff for payments
 it had made because of shortage in the clerk's accounts, for the
 payment of fees subsequently received to a trustee for the pur-
 pose of reimbursing such friends did not contemplate that
 any funds should come into the trustee's hands except fees of
 the office belonging to the county clerk.  (*Post, pp.* 50-52.)

2. **SUBROGATION.    Nature and theory of right.    Inherent
 justice.**

 The doctrine of subrogation adopted from the civil laws is found-
 ed upon the idea of substituting another person in place of the
 creditor, so that the person in whose favor it is exercised suc-
 ceeds to the rights of the creditor in relation to the debt, and
 does not necessarily rest or depend upon the acts of the creditor,
 but may be independent of him, and also of the debtor, but
 in either case the doctrine, in addition to inherent justice, must
 concur with some principle of equity jurisprudence.  (*Post, pp.*
 52, 53.)

3. **SUBROGATION.  Construction of agreement.**

 Where a county clerk agreed that fees received in his office to
 which he was entitled should be deposited in a bank to the
 credit of a trustee for the payment of his debts to friends who
 had repaid plaintiff indemnity company moneys which it had
 been obliged to pay because of the county clerk's deficiencies,
 the trustee's only duty was to receive such fees and disburse
 them, and it was not intended that he should take charge of

the county clerk's office, and plaintiff cannot claim the right to proceed against the trustee under the doctrine of subrogation on the ground that the trustee should have taken charge of the office and prevented the occurence of a subsequent shortage. (*Post, pp.* 53-55.)

4. **CONTRACTS. Validity.**
Where friends of a county clerk paid off a shortage in his account, an agreement between them for the payment of fees, subsequently received by him to a trustee to reimburse his friends, was unenforceable, if not absolutely null and void. (*Post, pp.* 53-55.)

5. **CONTRACTS. Farming office.**
A county clerk cannot farm out his office to another. (*Post, pp.* 55-59.)

6. **SUBROGATION. Inherent justice. Illegal act.**
Subrogation upon the theory of inherent justice cannot be predicated upon the failure to do an illegal act. (*Post, pp.* 55-57.)

Cases cited and approved: Lanier Lumber Co. v. Rees, et al., 103 Ala., 622; Meeker v. Larson, 65 Neb., 158; Massie v. Mann, 17 Iowa, 131; Lawrence v. U. S. (C. C.), 71 Fed., 228; Merchants', etc., Bank v. Tillman, 106 Ga., 55.

FROM MADISON.

Appeal from the Chancery Court of Madison County.—I. W. Ross, Chancellor.

W. G. Timberlake, for appellant.

W. H. Biggs, R. F. Spragins and C. G. Bond, for appellee.

MR. W. B. SWANEY, Special Justice, delivered the opinion of the Court.

Complainant, Fidelity & Deposit Company of Maryland, a corporation authorized to write official and other fidelity bonds in Tennessee, brought this suit in the chancery court of Madison county against T. C. Long, M. D. Meriwether, Ross Witherspoon, and W. N. True, seeking to recover large sums from them on account of certain alleged wrongful acts touching funds which came, or should have come, into the office of W. N. True, as clerk of the county court of Madison county.

An accounting was sought against T. C. Long and M. D. Meriwether for certain public funds alleged to have been received and collected by them as set out in the bill under a written contract between them, whereby it was claimed they took control of the office of the clerk of the county court and agreed to be responsible for all funds therein or which should thereafter come into said office, as well as the fees of the office. A recovery was sought against Ross Witherspoon for certain funds alleged to have been received by him, but it is not necessary to go further into this phase of the case, inasmuch as a demurrer was sustained as to him and no appeal was taken therefrom. A demurrer was also filed to said bill on behalf of M. D. Meriwether, which was also sustained, and no appeal was taken. A recovery was sought against W. N. True for certain sums set out

in the bill, which complainant had been compelled to pay for him to the State, Madison county, and certain individuals as surety on his official bonds.

The theory of the bill against T. C. Long was that complainant as surety, on the official bonds of W. N. True, while clerk of the county court of Madison county, had been forced to pay to the State, Madison county, and certain individuals sums aggregating $8,301.38   on which it had collected $621.96, leaving a balance of $7,679.42 due, on account of the defalcation of said True; that in April, 1900, said True was short in his accounts in about the sum of $2,260, which amount was made good by a number of his friends, Ross Witherspoon being among them, and that thereupon an agreement was made whereby T. C. Long took charge of said office and placed M. D. Meriwether as his own agent and deputy in charge of said office, with directions to collect all funds and fees of said office and deposit same in a bank in Jackson, and after paying monthly salaries to True and Meriwether of $50 each out of the fees, and paying premiums on a policy of $2,000 upon the life of True, the remainder of the fees should be used to reimburse Ross Witherspoon and other friends who had put up about $2,300 to pay True's shortage; that large sums had been so received by said Long, and much of it had been illegally paid out; and that during said period he had failed to collect other sums which should have come into said office.

Demurrers were filed by Long and True, which were overruled. Answers were then made by Long and True, denying the most material allegations of the bill.

A reference was made to the clerk and master, and, after taking proof, he reported that a large sum had gone into the hands of T. C. Long under a written agreement between himself and Ross Witherspoon, and that he should have collected other sums in addition thereto; that he had paid out all sums that came into his hands and turned back to True $1,838.-78, on March 4, 1902.

Exceptions were filed to said report by complainant and defendant Long, with the result that the chancellor sustained the exception of Long to so much of said report as attempted to hold him liable for any sum beyond that shown to have been received by him in said report and duly accounted for. The exceptions of complainant were all overruled. The bill was dismissed as to Long. A decree was entered against W. N. True for the amounts claimed, and no appeal was taken by him.

The case is now before us alone upon the appeal of complainant as to all matters claimed against Long. In order to fully understand the case, it is necessary to make a brief statement more in detail of the most material facts.

W. N. True was elected clerk of the county court of Madison county at the August election, 1898, for a term of four years. When he was inducted into

office in September, 1898, complainant became True's surety on all of his bonds for the aggregate sum of $25,000.   T. C. Long was chairman of the county court of Madison county part of this time, but devoted most of his attention to the duties of postmaster at Jackson and to farming.   In April, 1900, it was discovered that True was short in his accounts, much of the shortage being for moneys collected by him for the State.   Complainant was aware of this shortage, and one of its agents, W. W. Collins, came to Jackson and learned all the facts about it.   In order to prevent criminal prosecution and loss of the office, Ross Witherspoon and twenty-two other friends of True's agreed in behalf of True that if True should be allowed to continue as clerk, and the complainant would not cancel its bonds and prosecute True, they would each execute notes for $100, making a fund of $2,300, which should be used to cover said shortage.   This proposition was accepted, and no prosecution was begun against True.

The following written agreement was made by Ross Witherspoon and T. C. Long on May 1, 1900:

"Basis of agreement between T. C. Long and Ross Witherspoon whereby the latter indorsed the paper of Bud True for $100 and undertook to get others to do the same for the purpose of paying off his shortage of about $2,260 in his office as clerk of the county court of Madison county.

"It was agreed that I should employ and pay from the income of said office some competent deputy to

assist said True in the discharge of duties of said office; the salary of said deputy and of said True, until this shortage has been fully repaid and interest, shall be $50 per month each, and is only to be paid on the first of each month by me.  Said deputy is to collect all finances, keep same, and deposit all of each day's collections in the evening to my credit, in trust, in bank; he is to give bond as required in some good surety company to said True, which is to be -fied with his bond to the Fidelity & Deposit Company of Baltimore, Md.  I am to require said deputy to exhibit his books every two days and satisfy me that all collections are properly deposited, as required, and after paying the salaries above suggested, I am to disburse the remainder of fund belonging to the office in *pro rata* payments on each person's debt given for the payment of this shortage, allowing such as might be absolutely needed to keep premiums paid on a life insurance policy of $2,000, which is to be kept in force for the protection of those parties who have made advances to pay up this indebtedness of about $2,260.

"Jackson, Tenn., May 1, 1900.

"Ross Witherspoon.

"T. C. Long."

One Magevny had been deputy clerk under True until about this time, but he resigned, and M. D. Meriwether was appointed deputy clerk by True, and continued to act as such during the period covering the transactions involved in this controversy.

138 Tenn.—4

The above and foregoing written agreement between Long and Witherspoon was made, as appears from its face, and also from the oral testimony, for the purpose of protecting Ross Witherspoon and other friends of True, who had agreed, or might agree, to indorse notes for True to pay his mortgage then existing as clerk, and repaying to them on the notes out of fees of office coming to True to be there- after collected.

An account was opened in the name of T. C. Long, trustee, in the Second National Bank of Jackson on May 2, 1900, and the first deposit was for the sum of $3,141.10. M. D. Meriwether, deputy clerk, made all deposits, but, owing to severe illness, his testimony was not available. The first item deposited evidently consisted of the proceeds of the twenty-three notes for $100 each, discounted by True's friends, and some cash then in True's hands. This account continued from May 2, 1900, to March 4, 1902, during which time Deputy Meriwether not only deposited fees collected from the office belonging to True, but he also deposited large sums arising from revenues belonging to the State, Madison county and other funds belonging to litigants in said court. The total amount deposited to Long's credit, as finally fixed by the chancellor, was $46,348.75. The chancellor also held that it was never intended that any funds should come into the hands of Long as trustee, except fees of office belonging to True, which should be disbursed by said Long under said agree-

ment, and the net sum, after paying charges therein shown, used to repay Ross Witherspoon and other friends who had given notes to provide for the shortage of True, in April, 1900; and in this conclusion we concur.

There is no dispute as to T. C. Long having faithfully and honestly paid out every cent that was deposited to this credit, but complainant insists that several items were illegally paid out by him. An expert accountant in behalf of the complainant has testified as to many matters, claiming that the books show certain amounts are not properly accounted for, and that certain other sums should have been collected by Meriwether and deposited to the credit of Long. The great preponderance of the evidence shows that Meriwether, as deputy of True, looked after all the moneys which were deposited to the credit of Long, and also made out nearly all checks that were signed by Long. The proof utterly fails to show any wrongful or illegal disbursements of a single cent by Long or Meriwether. The account was closed March 4, 1902, after, from the best we can ascertain from the proof on file, Ross Witherspoon and his associates had been fully reimbursed, and all other obligations entitled to payment out of said funds under the agreement of May 1, 1900, had been paid, when T. C. Long gave a check to W. N. True, clerk, for $1,838.78 for the balance. W. N. True continued to be the legally authorized clerk of the county court from September, 1898, and complainant as

his only bondsman. True also served the remainder of his term, from March 4, 1902, until September, 1902, under the same bonds.

The proof fails to show that Long has paid out one cent illegally, or that he aided or advised True in doing any act which resulted in loss to any one. After this it was discovered that True had collected considerable amounts in revenues due the State, Madison county, and sums due litigants in his court, which had not been deposited by him or his deputy to the credit of Long in the Second National Bank of Jackson, and that True had, during that time or later, appropriated said sums to his own use. An effort is made to hold Long liable for these sums, as set out in the bill, as well as all other sums, upon the theory that Long had become a trustee *de son tort* by intermeddling with said funds belonging to the clerk's office; that they were trust funds, and when he intermeddled with them and assumed the management and control of said office, he thereby became a trustee *de son tort,* and if mistaken in this, and the contract between Long and Witherspoon be held void, then Long held said funds as an implied trustee, and was liable as trustee *ex maleficio.*

There is no doubt about these propositions being sound law under facts to which they are applicable.

The complainant also seeks to work out its equitable claim against said funds upon the averment that it had, as surety for True, paid the debts heretofore stated, aggregating about $8,000, to the State, Madi-

son county, and individuals named, and that Long, having intermeddled with said office, and undertaken to collect, receive, and disburse same, and having caused the shortage by his wrongful acts of commission and omission, complainant was entitled to be subrogated to the rights of True and the other parties against said Long. There is no doubt but in a proper case complainant would be entitled to be subrogated to all rights belonging to True and the others, if any, as to these funds. The doctrine of subrogation is founded upon the idea of substituting another person in the place of a creditor, so that the person in whose favor it is exercised succeeds to the rights of the creditor in relation to the debt. It was adopted from the civil law, and its basis is the doing of complete, essential, and perfect justice between all the parties without regard to form, and its object is the prevention of injustice. The right does not necessarily rest on contract or privity, but upon principles of natural equity, and does not depend upon the act of the creditor, but may be independent of him and also of the debtor. However, while subrogation does not always rest upon contract, there must, in every case where the doctrine is invoked, in addition to the inherent justice of the case, concur therewith some principle of equity jurisprudence, as recognized and enforced by courts of equity. 37 Cyc., 366, 367.

Now, under the facts of this case, under what principle of equity is complainant entitled to a recovery

against Long? The facts, as fully developed by the proof, show to our entire satisfaction that all that Long did in regard to said funds was to permit Meriwether, a deputy of True, to deposit funds in bank to Long's credit, together with official fees, which could not have been subjected to the payment of any debt of True's prior to the time they were earned, and that Meriwether and Long appropriated all of said funds so deposited to the payment of valid claims under the express or implied authority of True. This was also known, or should have been known, to complainant, and was subject to its inspection. No wrong was done True, and no damage resulted to True or complainant, in so far as moneys that were deposited to the credit of Long, as trustee, are concerned. But complainant now insists that it was the duty of Long to have supervised True's office and kept up with all collections made by him and his deputy, and account for all moneys collected by them and not deposited in the bank, under this alleged contract. We do not so understand this so-called agreement between Long and Ross Witherspoon. This contract manifestly was intended alone for the benefit of Ross Witherspoon and his associates, and was to expire when they were repaid out of the net official fees of True. It was never contemplated that any trust funds should be used for that purpose. Complainant agreed to this arrangement, and should have kept watch over True and his deputy. In addition, this so-called contract was

clearly unenforceable, if not absolutely null and void, and could not have been enforced certainly against the will of True.

No citation of authorities is needed to establish the further proposition that True could not farm out said office to Long, admitting, for the sake of argument, that Long agreed with True to manage and control the finances of said office, as claimed by complainant. The facts do not show any wrongful appropriation of any funds belonging to said office by Long or Meriwether, as heretofore stated, and hence the cases cited by complainant's learned counsel as to wrongful intermeddling with trust funds do not apply. We are of opinion that there is no inherent equity in favor of complainant as against Long. On the contrary, in order for complainant to succeed in this aspect of the case, it was necessary for it to insist that Long was an intermeddler without law or equity, and had damaged complainant because he did not further intermeddle and appropriate all public funds which came, or should have come, into said office. This would be in effect asking this court to predicate the doctrine of subrogation upon the failure of Long to do an illegal act.

In the case of *Lanier Lumber Co.* v. *Rees et al.,* 103 Ala., 622, 16 South., 637, 49 Am. St. Rep., 57, it was held, in an opinion by McCLELLAN, later Chief Justice, that a court of equity would not base an equity upon an illegal contract. The lumber company sought in that case to subject certain stock is-

sued by it to Robert Morrison, president of the Morrison Lumber Company, upon the allegation that the money that paid for the stock belonged to Morrison Lumber Company, a Tennessee corporation, and the title to the stock was fraudulent placed in the name of Morrison, and by him fraudulently transferred to Rees and others. The facts showed that Morrison Lumber Company, by its charter and under the laws of Tennessee and Alabama, had no authority or power to subscribe for stock in the Lanier Lumber Company. The court properly held that, in order for complainant to recover, it was necessary for the court to base it upon an illegal contract, which it held could not be done. The principle announced in the *Rees Case,* supra, we hold applicable here.

The authorities are uniform to the effect that subrogation will not be enforced unless it can be shown that there is some equitable doctrine upon which it can be predicated. *Meeker* v. *Larson,* 65 Neb., 158, 90 N. W., 958, 57 L. R. A., 901; *Massie* v. *Mann,* 17 Iowa, 131; *Lawrence* v. *U. S. (C. C.),* 71 Feb., 228; *Merchants', etc., Bank* v. *Tillman,* 106 Ga., 55, 31 S. E., 794.

To hold Long liable under complainant's theory as to his acts of omission would be, in effect, to make Long an indemnitor for True to complainant. There is no proof in this record to sustain any such contention.

It is also intimated that complainant relied upon Long to conduct the office of True. There is nothing

Fidelity & Deposit Co. v. Long.

to justify this contention.  This most unfortunate loss was more the result of complainant's carelessness than anything else.  True was short over $2,00(' in April, 1900, and the complainant was liable for this shortage as True's bondsman, and would have been compelled to pay it had not True's friends made it good.  Complainant profited by this agreement between Witherspoon and Long.  Complainant agreed to and did remain upon True's bonds for a valuable consideration paid by True during the remainder of his term of office.  This necessarily obligated complainant for all future official acts of True, and the duty of inspection rested upon complainant and could not be transferred to the shoulders of Long.  The resultant loss was occasioned more by the negligence of complainant in not checking up True's office than from any other cause, and certainly it cannot visit its losses upon Long under the facts of this case.

It necessarily follows that the decree of the chancellor is correct, and that it should be affirmed.  It is so ordered.